IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KAY'ANA ADAMS,                    )
     Plaintiff,                    )
                           )
v.                    )    Civil Action No. 1:23-cv-00305-KD-M
                           )
CITY OF MOBILE,                    )
     Defendant.                    )

## ORDER

This action is before the Court on the Motion for Summary Judgment and Brief in Support, (Docs. 60, 61), filed by Defendant City of Mobile ("the City"). Kay'ana Adams ("Adams") worked for the City as a firefighter. She was terminated after she allegedly came to work with a visible head and neck tattoo after receiving a specific order to adequately cover it. The City argues that Adams cannot sustain her burdens to show that she faced unlawful discrimination, retaliation, or a hostile work environment based on race, sex, sexual orientation, or religion. Instead, the City alleges that Adams was terminated for violating Mobile Fire Rescue Department ("MFRD") policies—including having a visible head and neck tattoo, failing to follow directives (insubordination), and displaying a lack of candor during the investigation. Upon consideration, and for the reasons below, the motion is **GRANTED**.

I.    **Findings of Fact[1]**

   A.  **Adams's Hiring and Training**

Kay'ana Adams is a homosexual, African American female. Adams also alleges she has been a practicing Muslim since early 2022. (Doc. 59-1 at 73 p. 163). Adams was hired by the City of Mobile with the MFRD in September 2021. Adams's recruit class was made up of four females,

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

three of whom were African American. (Doc. 59-1 at 35 p. 86; Doc. 59-43 at 3). Nine of the twenty-two recruits in her class were African Americans. (Doc. 59-43 at 3).

New hires train on MFRD rules and regulations at the training center, and this training continues throughout their probationary period. Adams spent six months in training and graduated on February 4, 2022, to become a probationary firefighter with a "working test period" or probationary period of six months.

Adams had three training captains—Captains Goosby, Thornburgh, and Peterson. Adams also had two mentors during her training period, Jewel Hunter ("Hunter")[2] and Mike Trenier, through a MFRD program known as the Collective. These mentors were supposed to guide Adams throughout her training.

During training, Adams learned the opportunities that she could exercise when she felt like she was being harassed or discriminated against, like filing a grievance. (Doc. 65-1 at 11 p. 54). Adams believed the culture was to not file a complaint. (Id.). Nonetheless, Adams submitted complaints of harassing conduct to her immediate supervisor and to anyone else that was supposed to be supervising her, including her Collective mentors and her training captains. (Doc. 59-1 at 21 p. 57).

The first complaint was made by Adams soon after she was hired in September 2021. (Doc. 59-1 at 27 p. 74). This complaint involved allegations that a fellow trainee—named Martinez—called her masculine nicknames, such as macho man. (Id. at 28 p. 75). Adams also complained that Martinez had commented that he did not want to work with women. (Doc. 65-1 at 18 p. 78). Adams filed this complaint after a verbal altercation between Martinez and Adams that escalated. (Id.). Adams states that Martinez started getting aggressive and started talking about sexual

---

[2] Hunter is a female African American. (Doc. 59-42 at 2).

orientation. (Id. at 19 p. 79). Adams then communicated this complaint formally to her training captains via email and informally to her Collective mentors. (Id. at 16 p. 76). Martinez was warned to cease the conduct, which did slightly subside according to Adams. (Id. at 17 p. 77). Hunter testified that Adams and Martinez were able to reconcile their disagreements and that she never heard any continuing complaints from Adams about Martinez. (Doc. 59-42 at 3).

The second complaint was made by Adams around October 2021. (Doc. 65-1 at 20–21 pp. 81–82). This complaint involved an incident during rope week—where trainees learn about ropes and tying knots. Adams overheard and witnessed other trainees attempting to tie nooses. Adams made this complaint informally to her Collective mentors who "just brushed it off." (Id. at 22 p. 84).

### B. Post training: Lathan Station

After training, Adams was assigned to Station 16 (Lathan Station) as a probationary firefighter. Probationary firefighters receive a digital task book to help them learn their job and the departmental rules and regulations, aided by their assigned captains. Her probationary period was scheduled for six months. The City's EEO policy was posted on a bulletin board at Lathan Station.

Captain Jason Craig ("Craig") was assigned as Adams's captain and immediate supervisor at Lathan Station. Craig was responsible for ensuring that Adams was informed of MFRD policies. During this time, Craig reported to District Chief Jack Busby ("Busby"). The chain of command proceeded from Busby to Deputy Chief John Young to Assistant Chief James Frank, and ultimately to Fire Chief Jeremy Lami.

Captain Rodrick Shoots ("Shoots") was another captain at Lathan Station. Shoots was not a direct supervisor of Adams, but he served as her Progressive Black Firefighters of Mobile ("PBF") representative. Shoots also reported to Busby. (Doc. 59-1 at 17 p. 122).

While stationed at Lathan Station, Adams became a member of PBF. Adams joined PBF because she believed she was experiencing some harassment at the Department. She also joined because her captain (Captain Craig) was the vice-president of PBF and because Captain Shoots was the president of PBF.

On Adams's first day at Lathan Station, she heard Tony Rutland ("Rutland") say that they would take a Johnny Mop and lubricate it and shove it into the rear ends of new recruits and that if the recruit was a woman, they would get a woman to do it. (Doc. 65-1 at 25–26 pp. 93–94). Later that day, Scott Haney ("Haney"), Patrick Fuller, and Rutland discussed why Adams did not want to be with a man and stated that maybe she should try it. (Id. at 26 p. 94).

A few months later, Adams raised a concern to Craig that the people around the station, particularly Rutland and Haney, had a problem with Adams being a black female and a lesbian. (Doc. 65-2 at 8–9 pp. 87–88). Craig asked if Adams would like to put this in writing and have Busby address it. (Id.). Craig testified that Adams refused stating that she wanted to fit in. (Id.).

At some point, Adams was asked by a colleague if it was okay if the other firefighters slept next to her in their underwear. (Doc. 65-1 at 57 p. 237). Adams brought this to the attention of someone,[3] and it was brought to Busby who sent out an order for the firefighters to review the uniform policy concerning sleepwear. (Id.).

At some point, Adams made an informal complaint to her Collective mentors about a statement made by Jesse Nicholson, a firefighter assigned to another station. (Id. at 31 p. 104). Adams states that Nicholson told her: "[N]o offense, but I just want to let you know that you look real good in your uniform, and stuff like that." (Id.). Nicholson also made comments about Adams trying men one day. (Id.).

---

[3] There is no evidence that this someone was a supervisor.

Within the first few months of her employment at Lathan Station, Adams also informally told Shoots that Rutland and a driver at Lathan Station would regularly call her sir or guy. (Id. at 33–34 pp. 113–14). Shoots confirmed that Adams had a conversation with him about things that Rutland would say in front of her that Adams felt were geared toward her. (Doc. 65-3 at 3–4 pp. 59–60). This included Rutland saying that the "new people get on the scene and don't do certain things" and that the "fire department is going to hell, it's the worst it's ever been, we can't even walk around in our underwear anymore or we've got to watch what we say." (Id. at 4 p. 60). Shoots also recalled that after Rutland returned from knee surgery,[4] Rutland asked him why the station was sent another female and commented that he would rather not work with a woman. (Id. at 25 p. 234). Adams also recalls Rutland making statements that he did not want to work with women. (Doc. 65-1 at 24 p. 89). Rutland denies making this statement. (Doc. 65-5 at 3 p. 11)

> ### i.    Adams makes a formal complaint against Haney.

On August 3, 2022, Adams submitted a formal complaint to Craig via email regarding Haney. (Doc. 65-11 at 3). The complaint included allegations that Haney used vulgar language "to express that he was aggravated over the fact that [Adams] was bringing a fan into the room" and that Haney had made unspecified comments about feminism in a degrading manner on three occasions. (Id.).

> ### ii.    Rutland makes a formal complaint against Adams.

On August 25, 2022, Rutland and Adams had a verbal dispute. Thereafter, Rutland submitted an Incident Report about Adams making "outbursts" that Rutland believed were "problematic." (Doc. 59-24).

---

[4] Rutland was off work from March 2022 until late July 2022. (Doc. 59-10 at 12 p. 50).

### C. MFRD Grooming Policy and Adams's Tattoo

The MFRD has a grooming policy in place to promote uniformity and attention to detail. (Doc. 59-7 at 18 p. 42). This includes a rule restricting tattoos on the face or neck. (Doc. 59-15). Rule 710, revised June 2021, reads:

1. Tattoos may be visible while in uniform. Any designs considered vulgar, racist, sexist, distasteful, displaying nudity or offensive images, a violation of the Department's harassment or discrimination policy, or otherwise deemed inappropriate are not permitted and will be covered in their entirety while representing the department.
2. Tattoos on the face or neck are prohibited.
3. Tongue splitting, abnormal shaping of the ears, eyes, nose, or teeth, and transdermal implantations other than hair replacements are prohibited.

(Doc. 59-15 at 3).

In the end of June 2022, Adams obtained a tattoo on the back of her head and neck (the "tattoo"). (Doc. 65-1 at 35 p. 121). Adams was aware of the grooming policy when she obtained the tattoo. (Id. at 9 p. 46). Specifically, Adams had read Rule 710. (Id.). However, Adams believed that the policy allowed her to cover up the tattoo while on duty. (Id. at 52 p. 191). Adams believed that Rule 710 was vague. (Id. at 38 p. 132).

Adams stated in her deposition that the only guidance she sought before getting the tattoo was Rule 710. (Doc. 59-1 at 61 p. 128). However, Jewel Hunter (one of Adams's Collective mentors) testifies that Adams sent her a photo of the tattoo in the location that Adams intended to get it in mid-June 2022. (Doc. 59-42 at 4).[5] Hunter says that Adams asked her for an opinion on the tattoo and Hunter advised Adams against getting it because of MFRD's grooming policy and the fact that Adams was still in her probationary period. (Id.). Adams replied that she was getting the tattoo anyway and that she was still young and could get another job elsewhere. (Id.).

---

[5] Adams does not deny that this conversation with Hunter occurred.

Craig, after learning of Adams's tattoo, had a discussion with Chief Busby as to whether the tattoo was in violation of the grooming policy. (Doc. 65-2 at 10 p. 96). Craig says that Chief Busby told him to hold tight because they were working on amending the policy and that Busby did not have an answer as to whether there was a violation. (Id.). Craig also had a conversation with the public safety director who told him that they were in the process of revising the tattoo policy. (Id.). Craig did not believe that Adams was in violation of the policy because the neck portion of her tattoo was covered with band-aids, and the policy said neck—not head. (Id. at 16 p. 103).

Shoots learned of Adams's tattoo when she came back to work with it. (Doc. 65-3 at 10 p. 145). He did not address the neck tattoo as being in violation of the policy because she had covered it up with band-aids and makeup. (Id. at 11 p. 146).

### D. OPR's First Investigation into Adams's Tattoo

On July 7, 2022, Fire Chief Lami ("Lami") forwarded a complaint to the Mobile Office of Professional Responsibility ("OPR") of a possible policy violation of MFRD Rule 710 regarding Adams's tattoo. (Doc. 59-33). Adams had previously posted a picture of the tattoo on social media. The tattoo starts at the base of her head and protrudes down her neck. (See Doc. 59-33 at 3). Based on this complaint, OPR investigated the situation by interviewing Adams and taking a picture of her tattoo. By July 7, 2022, Adams had grown out her hair and the tattoo was mostly covered. (Id.). OPR's report found that Adams was in violation of Rule 710 when she obtained a tattoo on her neck while employed with the MFRD. (Id. at 3). OPR's report contained an amended finding that the City has proposed a new tattoo policy, and that upon approval, Adams will be able to comply with the new policy if she maintains a hairstyle that covers the tattoo adequately. Adequately was defined "as seen in Figure 2." (Id.). Figure 2 is the photo taken of Adams on July 7, 2022. (Id.; Doc. 65-16 at 5).

### E.  Adams's September 8, 2022, Advisory Hearing

After the conclusion of OPR's investigation of Adams, Adams attended a September 8, 2022, advisory hearing with Shoots before MFRD Chiefs Morris, Frank, Young, and Busby. (Doc. 65-6 at 3–4 pp. 16–17). Chief Morris did most of the speaking and read aloud the contents of two letters dated September 8, 2022. (Id. at 5 p. 19). The first letter informed Adams that the OPR found her in violation of Rule 710 and that, as a result, her probationary period would be extended six months (September 11, 2022, extended to March 11, 2023). (Doc. 65-18). This letter also explained that Adams could maintain compliance with Rule 710 by maintaining "a hairstyle that covers the tattoo adequately (meaning keep your hair grown out to cover the tattoo on your head)." (Id.). However, the letter warned Adams that if she did not appropriately cover the tattoo at all times while on duty, she would be in "repeated violations that will lead to progressive discipline up to termination." (Id.). The second letter advised Adams that her probationary period was extended to March 11, 2023. (Doc. 59-22).

Chief Frank asked Adams if she understood what she needed to do to stay in compliance, and she assured him that she did. (Doc. 59-6 at 10 p. 28). Adams asked if she could wear a wig to comply, and she was told that she could. (Doc. 65-1 at 42 p. 145). Adams also recalls being told that she could use a bandage to cover it up and that she could use makeup. (Id. at 40–41 pp. 142–43). Adams hair was grown out during this hearing. (Id. at 54 p. 208).

Craig did not attend the hearing because Adams was only allowed one representative, and she chose Shoots. (Doc. 59-6 at 13 p. 31). Craig drove Adams downtown for the hearing, but Craig says that he never discussed the hearing with Adams or Shoots. (Doc. 59-5 at 26–27 p. 109–10). Craig was never told what happened at the meeting, and he was never told what Adams was supposed to do to comply with the rules. (Doc. 65-2 at 20 p. 111).

Chief Frank instructed Chief Busby to visit Lathan Station after the meeting and go over the letters with Adams and Craig to ensure that they understood what was required for Adams to stay in compliance. (Doc. 59-6 at 14 p. 32). Shoots recalls Busby visiting the station after the hearing and discussing the hearing with him. (Doc. 65-3 at 15 p. 166). Shoots says that Busby made the statement: "Take care of your people and tell Ms. Adams to get a big gun." (Id.). Busby also called Craig and told him to protect his troops the way he does and to protect himself and be careful. (Doc. 65-2 at 31 p. 136).

### F.  Other MFRD Employees with Tattoos on the Neck

Around the time of the September 8, 2022, advisory hearing, Chief officers of the MFRD were instructed to inspect and report possible violations of Rule 710 to OPR. (Doc. 59-6 at 8 p. 22). Two other MFRD employees were investigated regarding their tattoos—Mike Allen ("Allen") and Ron Lucky ("Lucky"). (Doc. 65-6 at 9 p. 28; Doc. 65-7 at 3, 4 pp. 20, 22). Allen was a white male fire-service driver. (Doc. 59-43 at 3). Lucky was an African American male probationary firefighter. (Id.).

Allen received a letter on August 17, 2022, from Chief Frank advising him that the OPR had found him in violation of Rule 710. (Doc. 65-19). However, the letter explained that Allen was in compliance with the City's new tattoo policy, so no further action would be taken. (Id.). Chief Frank attests that Allen's tattoo is on his shoulder and neck, and that OPR determined that Allen's tattoo was not visible above the neckline of a collared shirt. (Doc. 59-43 at 3–4). Thus, his tattoo is not in violation of the City's new tattoo policy because it was not visible.

Lucky received a letter on September 13, 2022, from Chief Morris advising him that the OPR investigated his tattoo and found that he was in violation of Rule 710 and the City's new tattoo policy. (Doc. 65-20). Lucky was directed to modify the tattoo before the end of his working test

period (3/12/23) to comply with the rules. (Id.). The letter advised Lucky that if he did not follow this directive, he would be subject to progressive discipline up to termination. (Id.). The letter also advised Lucky that he was required to submit a plan of action in carrying out this directive and that he would be administratively assigned to the MFRD Training Division until the modifications were complete. (Id.). Lucky was hired by the MFRD despite having a frontal neck tattoo. (Doc. 59-43 at 3). Chief Frank attests that Lucky's tattoo was not visible during the interview process because he wore a collared shirt and tie. (Id.). Lucky began the process of tattoo removal but later decided to resign from MFRD. (Id.).

Damonique Evans ("Evans") is an African American female with the MFRD who has a tattoo on the lower portion of the back of her neck. (Doc. 59-43 at 3). Evans was not investigated by OPR. (Id.). Chief Frank attests that Evans's tattoo is not visible above the neckline of a collared uniform shirt, and her tattoo would not violate the City's public safety tattoo policy. (Id.).

Adams also names Warren Stanley and Alan Campbell as two white firefighters who had visible neck tattoos with no consequences. (Doc. 64 at 9). Craig "does kind of remember Warren Stanley" having a neck tattoo. (Doc. 65-2 at 17 p. 105). The only details Craig remembers about Stanley are that he is white and that he last worked with the MFRD "three or four years ago." (Id. at 19 p. 107). Shoots recalls that a "Mr. Campbell" had a neck tattoo, but he does not testify that Mr. Campbell is white or that his name is Alan. (Doc. 65-3 at 7 p. 132). There is also no time frame when "Mr. Campbell" had a tattoo. There are no other details to support either Stanley or Campbell as comparators.

### G. Adams makes a religious accommodation request

On September 11, 2022, Adams requested a religious accommodation from MFRD to wear a hijab. (Doc. 59-25). Adams wanted an "opportunity to actually practice a religion that fascinated

[her] the most at that time." (Doc. 59-1 at 85 p. 214). Adams began exploring Islam after she acquired some Muslim friends and began practicing Islam in early 2022. (Doc. 65-1 at 46 p. 163). However, Adams had never been to a mosque and was not able to recall the name of the central religious text of Islam (i.e., the Quran) at the time of her deposition. (Doc. 59-1 at 75 p. 165).

On September 14, 2022, Adams filled out a request for accommodation for religious beliefs. (Doc. 65-22). The City inquired whether Adams was asking to wear a hijab at all times as part of her uniform, and Adams responded that she was requesting to wear her hijab during work but could remove it if deemed necessary. (Doc. 65-21). The request went to the City's Human Resources and Legal Departments to determine how to accommodate. (Doc. 59-8 at 25 p. 99).

Justus Browning ("Browning") of OPR was tasked with researching a consistent accommodation for Adams and any others. (Doc. 59-41 at 3). Browning testified that he spoke with Adams who told him that she had not been discriminated against in the past because of her religion. (Id.). Browning says he discussed the request with Lasky and George Glaser of OPR and expressed concerns of a potential conflict with the National Fire Protection Association ("NFPA") Guidelines. (Id.). In researching the request, Browning concluded that Adams could comply with NFPA guidelines by wearing a hijab with specific materials. (Id.). Browning also concluded that a uniform policy could be developed in accordance with MFRD's uniform standards. (Id.). Before completing the research, Adams was terminated by the MFRD. (Id. at 4).

### H.  Adams files a complaint against Rutland

Also on September 11, 2022, thirteen days after Rutland had submitted a complaint against Adams, Adams "gathered a lot of incidents" she had with Rutland and "put it in one formal complaint" that she emailed to Craig. (Doc. 59-1 at 37 p. 89; Doc. 65-12 at 3). Among other things, the complaint referenced Rutland stepping very close to Adams and Rutland making statements in

a rude tone like "you must be angry." (Doc. 65-12). Adams added that her "perspective as a black woman and the stereotype associated with black women" made it feel as though Rutland was attempting to provoke her with those comments. (Id.). Adams wrote: "We are all familiar with the term 'a[n] angry black woman.'" (Id.).

On September 12, 2024, Chief Frank forwarded the complaint by Adams to the Office of Professional Responsibility ("OPR"). The City created the OPR in January 2022. (Doc. 65-4 at 4 p. 16). OPR was formed to be a third-party entity to investigate a variety of issues, including instances of employee misconduct, and to create a fair and objective system of investigation. (Id.). The OPR Handbook states that "[t]he primary charge of OPR is to sustain a credible investigative system by ensuring the existence of responsive complaint investigations characterized by objectivity, integrity, and impartiality." (Doc. 65-15 at 4). OPR is ultimately responsible for determining whether an employee is in violation of a policy, but any disciplinary action that results from a violation comes from the department. (Doc. 65-4 at 6–7 pp. 22–23). Robert Lasky ("Lasky") served as the Director of OPR in 2022. (Id. at 3 p. 14).

The complaint submitted to OPR alleged five instances of misconduct by Rutland from March 2022 to September 2022. (Doc. 65-13 at 2). The five instances reported include Rutland's comments about "man toes," Rutland's comments about Adams's alleged involvement in a protected communication, Rutland's interaction with Adams at the lockers, Rutland's interactions with Adams outside, and Rutland's comments regarding "EMT Basics." (Id.).

OPR investigated the complaint and interviewed Rutland and Adams.[6] OPR ultimately found that Rutland violated MFRD policy during two of these instances—specifically his comment about

---

[6] As an aside, the video from Adams's interview on September 19, 2022, shows that her hair had been cut shorter than when her photo was taken on July 7, 2022. (Compare Doc. 59-30 at 5 with Doc. 59-30 at 3 (Figure 2)).

man toes (because it denigrated a written policy regarding sleepwear) and him bringing to light Adams's alleged involvement in a protected conversation in training. (<u>Id.</u>). OPR did not find Rutland in violation of MFRD or City rules for his statement that Adams must be angry because "there is insufficient evidence that Rutland's statements were discriminatory." (<u>Id.</u> at 7). "Adams denied Rutland specifically used the words 'Angry Black Woman' but said he asked her if she was angry several times." (<u>Id.</u>).

Not to be outdone, on September 29, 2022, Rutland told Chief Frank that he wanted to be transferred from working with Adams and that Adams's neck tattoo was currently visible. (Doc. 59-6 at 19 p. 45; Doc. 59-10 at 5–6 pp. 17–18). This conversation occurred three days after Rutland was interviewed by OPR regarding the complaint Adams made against him. (Doc. 65-4 at 13–14 pp. 61–62).

### I. Adams's Grade Sheet

Sometime on or after September 23, 2022,[7] Craig submitted Adams's Probationary Firefighter Evaluation Form (i.e., grade sheet). (Doc. 65-24). Craig graded Adams excellent in each of the six categories and recommended that she be permitted to acquire permanent status. (<u>Id.</u>). Craig's general comments were that Adams "takes pride in contributing to the organization's success" and "is committed to the department's goals." (<u>Id.</u> at 3). Craig's biggest area of improvement for Adams was that she "can get too emotional at times." (<u>Id.</u>). When asked about this comment at his deposition, Craig explained that Adams "is a high-strung individual to where she wants to be the best at everything." (Doc. 65-2 at 27 p. 132). Craig added: "I think she feels that way because of

---

[7] There is no evidence to support Adams's assertion that Craig submitted the grade sheet on September 11, 2024. Craig testified that he discussed the evaluation with Adams and that it was submitted after she signed it. (Doc. 65-2 at 29 p. 134). The signatures would indicate that this occurred on or after September 23, 2022. Moreover, Craig specifically testified that "I don't know what date . . . Carmichael came over with the grade sheet" asking to change it. (<u>Id.</u> at 30 p. 135).

her size. And she was smaller than everybody in the class. And she was a female. She wanted to make sure that everybody knew that she could do her job." (Id.). Craig stated that Adams had more dedication to the job and gave more effort than any female that he worked with in the military and the MFRD. (Id.).

Craig was not aware that Adams's probation had been extended when he completed this grade sheet. (Doc. 65-2 at 41). The grade sheet was signed on September 23, 2022, by Craig and Adams. (Doc 65-24 at 4). Craig states that after he filled out the grade sheet, Captain Carmichael ("Carmichael"), who was filling in for Busby, came to the station and told Craig that they wanted him to change Adams's grade sheet to reflect termination. (Doc 65-2 at 30–31). Craig refused. (Id. at 30). Craig states that Carmichael told him to mark "extend" if he would not change it. (Id.).

### J. Attempted Tattoo Inspections on September 29, 2022

After Frank was informed of Adams's alleged violation of the directive to keep the tattoo covered, Frank spoke with Chief Lami over the phone about Adams's tattoo. (Doc. 59-6 at 22 p. 49). Lami contacted Lasky and asked him how to proceed. (Doc. 65-8 at 4 p. 37). Lami also verified through Captain Stacy Everson, who had contact with Adams on September 29, 2022, that Adams's tattoo was clearly visible above her collar and natural hairline. (Doc. 59-30 at 6)

Chief Lami told Frank to have Chief Keller send someone to get a picture of Adams's tattoo. (Doc. 59-6 at 22 p. 49). Keller instructed Chief Ballard to carry out the task. (Doc. 65-9 at 3 p. 13). Ballard was responsible for Lathan Station on that day because he was on an overtime shift. (Doc. 65-9 at 5 p. 15). When Ballard arrived at Lathan Station, he told Craig that he was there to evaluate Adams's tattoo and that he needed to take a picture of the tattoo to determine if there was a policy violation. (Doc. 59-11 at 30 p. 170; Doc. 65-9 at 6 p. 16). Shoots was also made aware that Ballard was there to take a picture of Adams's tattoo. (Doc. 59-11 at 30 p. 170; Doc. 65-9 at 6 p. 16). Craig

called Adams over and told her that Ballard needed a picture of her tattoo. (Doc. 65-3 at 17 p. 170). Ballard also told Adams that he was there to photograph her tattoo. (Id.). Adams rebuffed the request, stating that she was tired of being harassed. (Id.).

Shoots recalls calling Chief Lami, Chief Frank, and Lasky and receiving no answer. (Doc. 59-11 at 31 p. 171). Lasky, however, returned Shoots' call. (Id.). Both Shoots and Lasky recall Lasky advising Shoots that he could take his own picture of Adams's tattoo for independent documentation. (Doc. 59-30 at 6; Doc. 65-3 at 19 p. 172). Lasky recalls advising Shoots to allow Ballard to take the photo of Adams's tattoo. (Doc. 59-30 at 6). Shoots recalls Lasky saying that he had not heard anything about a picture of Adams's tattoo. (Doc. 59-11 at 31 p. 171).

After ten to fifteen minutes of discussion between Shoots, Ballard, and Adams, Ballard left the station without a photo. (Doc. 59-1 at 72 p. 160; Doc. 65-9 at 8 p. 21). Ballard remembers the tattoo being visible but partially covered with a band-aid. (Doc. 59-2 at 10 p. 20). Ballard's Incident Report on the day of the inspection indicates that Adams's tattoo was plainly visible. (Doc. 59-27 at 2).

After leaving, Ballard called Keller. (Doc. 65-9 at 10 p. 26). Ballard recalls telling Keller that he did not feel comfortable pushing the issue and that Adams, Craig, and Shoots claimed harassment. (Id.). Keller called Chief Frank and told him that he could not get the photo. (Doc. 59-6 at 24 p. 52). Chief Lami called Keller and told Keller that he needed to get a picture of the tattoo. (Doc. 65-10 at 3 p. 19). Keller then called Ballard and advised him to direct Craig and Adams to report to Station 12 (Keller's station). (Doc. 59-2 at 16 p. 26).

When Craig and Adams arrived, Keller told Craig that he had been given an order to take a picture of Adams's tattoo. (Doc. 65-10 at 4–5 pp. 21–22). Keller explained to Adams the MFRD rule on obeying directives and advised her that he had been given a directive to take a picture of

her tattoo. (Id. at 6 p. 24). Keller recalls Adams saying that she did not feel comfortable turning around in the presence of men. (Id. at 7 p. 25). Keller offered to get a female supervisor. (Id.). Keller recalls Craig strongly objecting and saying that he believed Adams needed representation. (Id.). Keller remembers saying "okay" and then Adams leaving the office and going back to the truck. (Id.).

Keller called Lami and explained the situation and Lami said he would get back to Keller. (Id.). Lami remembers Keller saying that Adams was objecting to the picture due to discomfort. (Doc. 59-8 at 10–11 pp. 42–43). Lami later called Keller back and told him to tell Adams that she could either have the photo taken or be placed on paid administrative leave. (Id. at 11 p. 43). Keller told Craig to bring Adams into the office. (Doc. 59-7 at 12 p. 25). At some point, Craig told Adams that the picture is going to be taken regardless. (Doc. 65-2 at 37 p. 149). Adams reluctantly agreed to take the picture. (Doc. 59-7 at 13 p. 26). The picture shows that the tattoo at the base of the head was visible with a band-aid covering the neck. (See Doc. 59-30 at 7). Craig testified that he had no reason to believe that Adams was being asked to have the picture taken because of her race. (Doc. 59-5 at 43 p. 185).

### K. OPR Investigates Adams's Tattoo

On October 5, 2022, Craig, Shoots, and Adams received notices that OPR was investigating for possible policy violations during the events on September 29, 2022. (Doc. 65-27). Justus Browning of OPR was the lead investigator. (Doc. 59-3 at 10 p. 35). OPR collected evidence and provided findings of fact to departments heads. (Id. at 11–12 pp. 41–42). During OPR's interview of Adams, Adams's attorney was present and questioned the tone of the interview asking whether OPR was conducting an interview or an interrogation. (Doc. 65-4 at 16 p. 74). Adams's attorney also commented during the interview that the interviewers were being "accusatory" and

"argumentative." (Id. at 17 p. 75). At some point during the investigation, Adams was asked whether she had cut her hair after being advised on September 8, 2022, that she was to maintain a hairstyle that covered her tattoo. (Doc. 59-30 at 14). Adams denied that she had cut her hair between September 8 and September 29. (Id.).

On November 5, 2022, OPR's investigative findings on Adams were given to Chief Lami. (Docs. 59-30). OPR found that Adams was in violation of (1) the City's new tattoo policy, (2) MFRD Rule 710 regarding earrings, (3) MFRD Rule 100 and Mobile County Personnel Board ("MCPB") 14.2(h) regarding obeying a supervisor's order, (4) MFRD Rule 100G and MCPB 14.2(h) regarding insubordination, and (5) MFRD Rule 100B and MCPB 14.2(c) regarding candor. (Doc. 59-30).

### L.  Adams Files a Step-One Grievance

On October 12, 2022, one week after being notified of the OPR investigation, Adams filed a step-one grievance with the MCPB claiming "the fact that Policy 710 is being unfairly applied to [her]." (Doc. 65-28). Seven days later, Chief Lami wrote Adams to explain that the MCPB Director granted an extension of thirty days to respond to the grievance. (Doc. 65-29). The letter indicated that the MFRD takes harassment claims seriously although Adams did not follow the proper reporting procedure and that OPR would be investigating her claims. (Id.).

### M. Adams's Termination and Lawsuit

On November 10, 2022, after the OPR investigation, the MFRD terminated Adams's probationary employment. (Doc. 59-34). The termination letter indicates that Adams was fired because she violated City and MFRD rules and MCPB Rule 14.2. (Id.). Adams signed the termination letter but wrote that she did not understand the grounds of her termination or what she was signing. (Doc. 59-1 at 91 p. 233). Chief Morris—who signed the termination letter—is an

African American and participated in the discussion to terminate Adams along with Chief Frank and Chief Lami. (Doc. 59-9 at 9 p. 36). Adams was terminated without receiving a decision on her religious accommodation request. (Doc. 65-8 at 10 p. 99).

On October 10, 2023, Adams filed a complaint against the City of Mobile alleging employment discrimination, hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as made actionable by Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), and the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"), as made actionable by Section 1983. (Doc. 1 at 1).

## II.      Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the

18

nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

## III.    Analysis

Adams's complaint alleges seven causes of action: (1) discrimination on the basis of race, sex, sexual orientation, and/or religion under Title VII; (2) hostile work environment on the basis of race, sex, sexual orientation, and/or religion under Title VII; (3) retaliation under Title VII; (4) race discrimination in violation of Section 1981 under Section 1983; (5) hostile work environment on the basis of race in violation of Section 1981 under Section 1983; (6) discrimination on the basis of race, sex, sexual orientation, and/or religion in violation of the Equal Protection Clause under Section 1983; and (7) hostile work environment on the basis of race, sex, sexual orientation,

and/or religion in violation of the Equal Protection Clause under Section 1983. (Doc. 1). The City moves for summary judgment as to all claims asserted by Adams. (Doc. 60).

## A. Discrimination Claims: The First, Fourth, and Sixth Causes of Action

Adams's first, fourth, and sixth causes of action allege discrimination based on race, sex, sexual orientation, and religion pursuant to Title VII, Section 1981, and Section 1983. (Doc. 1). The legal elements of these claims are identical. See Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985). A plaintiff asserting discrimination under Title VII and under Sections 1981 and 1983 must prove intentional discrimination. Id. "Therefore, we need not discuss plaintiff's Title VII claims separately from [her] [S]ection 1981 and [S]ection 1983 claims." Id.

To survive summary judgment, "a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). A plaintiff can do this in three ways. First, by presenting direct evidence of discriminatory intent. See, e.g., Jefferson v. Sewon America, Inc., 891 F.3d 911, 921–22 (11th Cir. 2018).[8] Second, by satisfying the McDonnell Douglas burden-shifting framework. Lewis, 918 F.3d at 1220. Third, by demonstrating a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination. See, e.g., Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023), cert. denied sub nom. No. 23-1235, 2024 WL 4426607 (U.S. Oct. 7, 2024).

---

[8] The City argues that Adams has put forth no direct evidence of discrimination on any of her protected classification. (Doc. 61 at 23). Adams does not dispute this in response. Therefore, this method of proving discrimination will not be analyzed.

**1. Adams cannot satisfy the <u>McDonnell Douglas</u> burden-shifting framework.**

"Properly understood, <u>McDonnell Douglas</u> is an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action was the employee's race." <u>Tynes</u>, 88 F.4th at 941. Under this framework, "a plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." <u>Lewis</u>, 918 F.3d at 1220–21 (Step One). "The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination." <u>Tynes</u>, 88 F.4th at 944.

If a plaintiff makes a prima facie showing of discrimination, the burden shifts to the defendant. <u>Id.</u> The defendant can rebut the presumption "by offering evidence of a valid, non-discriminatory justification for the adverse employment action." <u>Id.</u> (Step Two). If the defendant rebuts the presumption, the plaintiff must demonstrate that the defendant's proffered reason was "merely a pretext for unlawful discrimination." <u>Lewis</u>, 918 F.3d at 1221 (Step Three). This obligation "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been" intentionally discriminated against. <u>Id.</u> (alterations in original) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

Neither party disputes that Adams is a homosexual, African American female and that she was fired. (Doc. 61 at 23; Doc. 64 at 22). Neither party disputes that Adams was qualified to be a firefighter. (Doc. 61 at 23; Doc. 64 at 22). Thus, Adams has shown "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question." <u>Lewis</u>, 918 F.3d at 1220–21.

The remaining burden for Adams on Step One is showing "(4) that her employer treated 'similarly situated' employees outside her class more favorably." Id. at 1221. This requires Adams to present "evidence of a comparator." Tynes, 88 F.4th at 944. A comparator is someone who is "similarly situated in all material respects." Id. Although this is "a high bar to meet," id. at 947, "the plaintiff and her comparators need *not* be 'similar in all but the protected ways.'" Lewis, 918 F.3d at 1227 (quoting Young v. United Parcel Serv., Inc., 575 U.S. 206, 228 (2015)). The relevant inquiry is "whether the employer subjected them to different employment policies." Lathem v. Dep't of Child. & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999). For example, comparators may be valid where the plaintiff and the comparators were all subject to the same "workplace rules or policies." Id.

The all-material-respects standard "leaves employers the necessary space to make appropriate business judgments." Lewis, 918 F.3d at 1228. "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." Id. This standard "serves the interest of sound judicial administration by allowing for summary judgment in *appropriate* cases—namely where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." Id. at 1229.

Here, Adams offers evidentiary support for three comparators[9]: Mike Allen (a white male), Robert Lucky (an African American male), and Damonique Evans (an African American female). (Doc. 64 at 22–23). Adams, Allen, Lucky, and Evans were MFRD employees subject to MFRD rules. Because the four were subject "to the same employment policies, we must examine whether

---

[9] Adams also references two other alleged comparators, Campbell and Stanley. But as explained, infra Part I.F., neither is supported with adequate facts for the Court to consider whether they are in fact proper comparators.

their conduct and respective punishments were similar." <u>Lathem</u>, 172 F.3d at 793. "The most important factors in the analysis are the nature of the offenses committed and the punishments imposed." <u>Id.</u>

In this case, all four employees had neck tattoos, but the tattoos were in different places. For example, there is no evidence disputing that Evans's tattoo was not visible above the neckline of a collared uniform shirt. (Doc. 59-43 at 3, 6–8). Evans was not investigated by OPR because her tattoo would not violate the City's new tattoo policy. (Doc. 59-43 at 3).

Likewise, there is no evidence disputing that Allen's tattoo was not visible above the neckline of a collared shirt. (<u>Id.</u> at 3–4, 10). Allen was investigated by the OPR. (Doc. 65-19). On August 17, 2022, he received a letter advising him that he was in violation of MFRD 710 but compliant with the City's new tattoo policy. (<u>Id.</u>). The letter advised that "no further action [will] be taken for the violation of MFRD Rule 710." (<u>Id.</u>). Therefore, Evans and Allen had neck tattoos, but neither were visible above the uniform neckline. Neither Evans nor Allen received punishment for their tattoos.

Lucky had a frontal neck tattoo. (Doc. 59-43 at 3). On September 13, 2022, Lucky received a letter from Chief Morris advising him that the OPR investigated his tattoo and found that he was in violation of MFRD 710 and the City's new tattoo policy. (Doc. 65-20 at 2). Lucky was directed to modify the tattoo before the end of his working test period (3/12/23) to comply with the rules. (<u>Id.</u>). The letter advised Lucky that if he did not follow this directive, he would be subject to progressive discipline up to termination. (<u>Id.</u>). The letter also advised Lucky that he was required to submit a plan of action in carrying out this directive and that he would be administratively assigned to the MFRD Training Division until the modifications were complete. (<u>Id.</u>). Lucky began the process of tattoo removal but later decided to resign. (Doc. 59-43 at 3).

Adams had a tattoo on the back of her neck and head. (Doc. 59-17 at 2). On September 8, 2022, Adams received a letter from Chief Morris advising her that the OPR investigated her tattoo and found that it was in violation of MFRD 710. (Doc. 65-18). The letter explained to Adams that she could maintain compliance with the City's new tattoo policy by keeping the tattoo adequately covered with a hairstyle. (Id.). The letter advised Adams that her working test period would be extended six months and that a failure to keep the tattoo adequately covered will mean she is in repeated violations that will lead to progressive discipline up to termination. (Id.).

A major difference in Lucky's and Adams's conduct is that Lucky had his tattoo before he was hired, but Adams obtained her tattoo after she was hired and reviewed the tattoo policy. Still, the closest comparator that is similarly situated in all material respects is Lucky. Lucky's punishments were as follows: (1) Lucky was directed to modify the tattoo to comply with the City's new tattoo policy by the end of his working test period, (2) Lucky was required to submit a plan of action to accomplish compliance, and (3) Lucky was administratively assigned to the MFRD Training Division until the modifications were complete. (Doc. 65-20 at 2). Adams's punishment was a six-month extension of her probationary period. (Doc. 65-18 at 2). Adams was not asked to modify her tattoo to be compliant. She was asked to adequately cover the tattoo on her head. (Id.). Adams has failed to show that Lucky was treated more favorably than her regarding the extension of her probationary period.

Moreover, Adams was terminated after a second OPR investigation which found that Adams was in violation of (1) the City's new tattoo policy, (2) MFRD Rule 710 regarding earrings, (3) MFRD Rule 100 and Mobile County Personnel Board ("MCPB") 14.2(h) regarding obeying a supervisor's order, (4) MFRD Rule 100G and MCPB 14.2(h) regarding insubordination, and (5) MFRD Rule 100B and MCPB 14.2(c) regarding candor. (Doc. 59-30). None of Adams's offered

comparators engaged in similar conduct as Adams did before her termination. "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." Lewis, 918 F.3d at 1228. Therefore, Adams has not presented a prima facie case of discrimination for the termination of her employment.

### 2. Adams has not displayed a convincing mosaic.

Apart from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting a "convincing mosaic" of "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022). This requires "enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." Tynes, 88 F.4th at 946 (quoting Jenkins, 26 F.4th at 1250).

In proving a convincing mosaic, a plaintiff "may point to any relevant and admissible evidence." Id. at n.2. Probative evidence is likely "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." Id. (quoting Jenkins, 26 F.4th at 1250). The convincing mosaic standard can allow a plaintiff to survive summary judgment even when she cannot identify a similarly situated comparator. Id.

Adams argues that she has submitted sufficient evidence that when viewed in its totality supports an inference of discrimination. (Doc. 64 at 26). This evidence includes (1) the request to have Adams's picture taken on September 29, 2022, originating from a "chance meeting" between Rutland and Frank; (2) the MFRD sending Ballard to take Adams photo; (3) the fact that Keller

was asked to check Adams's compliance with the grooming policy; (4) Lasky telling Shoots that he did not know what was going on the day the picture was taken; (5) OPR's investigative process; (6) Busby's "ominous" warnings to Craig and Shoots; (7) the City's thirty day extension to respond to Adams's grievance; (8) Carmichael directing Craig to change Adams's grade sheet to reflect a recommendation of termination on September 11, 2022; and (9) Adams's termination before receiving a decision on her religious accommodation request. (Doc. 64 at 23–25).

First, in evaluating the totality of the evidence, the Court must not lose sight of the obvious requirement that the motivation behind the termination must be illegal discrimination; in this case there must be evidence that what lies behind the decision to terminate Adams was her race, sex, sexual orientation, or religion. In Adams's argument of a convincing mosaic (and pretext), Adams throws allegations and facts against the wall and leaves it to the Court to try and discern what inferences a reasonable factfinder might make from them. This approach is ineffective in meeting Adams's burden.

For example, Adams's reliance on the fact that Rutland's comments started the September 29 inquiry does not further her claims of illegal discrimination by the City. Adams must show "a convincing mosaic of circumstantial evidence that would allow a jury to infer . . . intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Rutland was not the decision maker; his purported motivations (i.e., that he disliked working with women) are not relevant to the inquiry of whether the City had a discriminatory intent. At base, Adams presents no evidence to advance the assertion that Frank or Lami's decisions to investigate Adams's tattoo compliance were motivated by her race, sex, sexual orientation, or religion.

Moreover, the facts that Ballard was asked to take Adams's photo and that Keller was asked to check on Adams compliance do not support an inference of discrimination. After a discussion with Lami, Lasky decided to send a supervisor to take Adams's picture, rather than an OPR investigator. (Doc. 65-8 at 4 p. 37). Keller instructed Ballard to carry out the task because Ballard was responsible for Lathan Station that day. (Doc. 65-9 at 5 p. 15).

As to the allegation that Adams was not treated as kindly as Rutland during her interview, again this does nothing to advance the claim of the City's illegal discrimination. Adams and Rutland both filed complaints against one another. The Court notes that Rutland did not get out of his OPR investigation unscathed. OPR found Rutland in violation of MFRD policy on two instances alleged by Adams, and OPR remarked that Rutland's language during his interview was inappropriate. (Doc. 65-13 at 8). There is absolutely nothing in the record to indicate that the OPR investigators were motivated by a discrimination towards Adams because of her race, sex, sexual orientation, or religion.

Adams also takes issue with the fact that the City was given a thirty-day extension to respond to her October 12, 2022, step-one grievance alleging that MFRD Rule 710 was being unfairly applied to her. However, since the OPR investigation was already proceeding on her second alleged violation, the Court fails to see any mischief in the thirty-day extension.

Adams notes that her September 11, 2022, request for accommodation for her newfound religion was pending when she was terminated. However, Adams fails to rebut the City's reasonable explanation that the development of a plan to allow firefighters to safely wear hajibs was in the works immediately after the request was made. There is simply no evidence that the City resisted this request; rather the evidence indicates that the City was actively trying to accommodate Adams by exploring fire resistant hajibs and researching how other fire departments

had handled the situation. Accordingly, this fact does nothing to convince a reasonable factfinder that illegal discrimination was afoot.

Adams alleges that Busby made ominous statements to Craig and Shoots. Specifically, Busby told Shoots: "Take care of your people and tell Ms. Adams to get a big gun." (Doc. 65-3 at 15 p. 166). Likewise, Busby told Craig to protect his troops. (Doc. 65-2 at 31 p. 136). Busby made these statements after Adams was warned that her failure to adequately cover her tattoo would result in termination. Busby's statements do not support Adams's allegations of discrimination. The Court cannot discern what Busby meant, and Adams has failed to argue how his statements support an inference of discrimination based on her race, sex, sexual orientation, or religion.

Adams also alleges that Lasky made ambiguous statements to Shoots on September 29, 2022. Shoots recalls Lasky saying that he had not heard anything about a picture of Adams's tattoo. (Doc. 59-11 at 31 p. 171). However, Shoots admits that Lasky advised him to take his own picture of Adams's tattoo for documentation. (Doc. 65-3 at 19 p. 172). And Lasky recalls advising Shoots to allow Ballard to take the photo of Adams's tattoo. (Doc. 59-30 at 6). Adams views this conversation as showing a "discrepancy in Lasky's story [which] raises suspicions of the MFRD's intent." (Doc. 64 at 24). Even viewing this evidence in the light most favorable to Adams, it fails to show any inference that the City discriminated against Adams on the basis of race, sex, sexual orientation, or religion.

Adams points to a final incident that she alleges raises suspicions of discrimination: The mystery behind Carmichael's request to Craig to change Adams's evaluation to a recommendation of termination or at least extension of probation. Adams argues that the date of this request implies that the City knew they were going to terminate Adams before her grievance could be heard. (Doc. 64 at 25). But this fact is hampered by a lack of context, specifically when the request to change

28

the grade sheet occurred. Adams asserts the date to be September 11, 2022, but Adams provides no evidence in support. Craig testified that he discussed the evaluation with Adams and that it was submitted after she signed it. (Doc. 65-2 at 29 p. 134). The evaluation was signed on September 23, 2022. (Doc. 65-24). And Craig specifically testified that "I don't know the date . . . Carmichael came over with the grade sheet." (Doc. 65-2 at 30 p. 135). Thus, it is not clear when the request to change the grade sheet happened. The inference that Adams's alleges—that the date of the request implies that the City knew they would terminate Adams—is not discernable.

But even if Carmichael's action is taken as suspect, three questions remain: Is this fact enough to show that Adams was terminated based on her religion? Absolutely not. Is it enough to show that she was terminated based on her race? No. Is it enough to show that she was terminated based on her sex or sexual orientation? No. At best, it shows that management wanted Craig to concur in Adams's possible termination or at least in the extension of her probation (which had occurred on September 9).

### 3. Adams fails to show pretext.

An employee shows pretext by casting sufficient doubt on the employer's offered nondiscriminatory reason for taking the employment action. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). An employee does this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. However, a "reason is not pretext for discrimination 'unless it is shown both that the reason was false, *and that discrimination was the real reason*.'" Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis added) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

The City argues that it has articulated legitimate, race neutral reasons for Adams's termination—her failure to follow City policies, including her visible head and neck tattoo, her insubordination, and her lack of candor. Indeed, Adams's termination letter indicates that she was fired because she violated City and MFRD rules and MCPB Rule 14.2. (Doc. 59-34). Adams responds that the same evidence that creates a convincing mosaic is evidence that the City's offered reason is pretextual. (Doc. 64 at 19–22). But for the same reasons that those facts do not show a convincing mosaic of discrimination, a reasonable factfinder could not rely on those facts to find that the city's reasons are pretextual.

### 4. Adams's discrimination claims cannot survive under the mixed-motive theory.

Adams argues that even if she cannot survive summary judgment through McDonnell Douglas or convincing mosaic, she can survive under the mixed-motive theory of discrimination. This is an alternative theory of causation for proving discrimination. McCreight v. AuburnBank, 117 F.4th 1322, 1331 (11th Cir. 2024).[10] "Mixed-motive discrimination . . . allows for liability when an employment decision motivated by a *legitimate* reason—usually poor work performance—is also infected by an *illegitimate* reason—illegal discrimination." Id. at 1326. A plaintiff only needs to show that an illegal reason played a part in the decision—not that it was dispositive. Id. at 1331. Still, a plaintiff alleging mixed-motive discrimination must provide "sufficient evidence for a reasonable jury to infer intentional discrimination". Id.

---

[10] Mixed-motive theory offers the same potential remedies (compensatory and punitive damages plus back pay and injunctive relief). "But there is one important difference: if a plaintiff prevails under a mixed-motive theory, an employer can still avoid damages and certain equitable relief by showing that it would have taken the same action even without the illegal motivation." McCreight v. AuburnBank, 117 F.4th 1322, 1332 (11th Cir. 2024).

Again, Adams points to the same allegations of facts she cited for pretext to summarily argue that there is sufficient evidence that the decision to terminate Adams was—at least in part—due to unlawful discrimination. And again, the Court finds the evidence inadequate or undeveloped.

In sum, Adams has failed to present sufficient evidence for a reasonable jury to infer discrimination on behalf of the City. Accordingly, the City's motion for summary judgment is **granted** as to the first, fourth, and sixth causes of action alleging discrimination.

### B. Hostile Work Environment Claims: The Second, Fifth, and Seventh Causes of Action

Adams's second, fifth, and seventh causes of action allege hostile work environment pursuant to Title VII and Section 1981 and the Equal Protection Clause under Section 1983. (Doc. 1). The same standards of proof and the same analytical framework apply for all these hostile work environment claims. See Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009). To prevail on this claim Adams is required to prove the following elements: (1) that she belongs to a protected group; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment. Id.

Here, neither party disputes that Adams is a homosexual, African American female and is a member of a protected class. (Doc. 61 at 26; Doc. 64 at 28). Further, neither party disputes that Adams was subject to unwelcome harassment. (Doc. 61 at 26; Doc. 64 at 28). Indeed, the record shows formal and informal complaints submitted by Adams during her employment. (Doc. 64 at 28–29) (collecting comments).

Adams has also sufficiently demonstrated that the City is responsible for Adams's environment and that the City had knowledge of several of her complaints. "An employer is directly liable for

hostile environment sexual harassment if it knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 647 (11th Cir. 1997). Thus, a reasonable jury could find that Adams has established three of the five elements for her hostile work environment claim. The remaining questions are whether Adams faced harassment based on her protected characteristics and whether that "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." <u>Bryant</u>, 575 F.3d at 1296.

"It is a 'bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII.'" <u>Jones v. UPS Ground Freight</u>, 683 F.3d 1283, 1297 (11th Cir. 2012) (quoting <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 809 (11th Cir.2010) (*en banc*)). "Therefore, only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." <u>Id.</u>

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1246 (11th Cir. 1999). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." <u>Id.</u> (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). In other words, the environment must be considered "hostile or abusive" by the victim and by the perspective of a reasonable person in the plaintiff's position considering all the circumstances. <u>Id.</u>

Likewise, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or

abusive working environment." Id. The following four factors should be considered in determining whether harassment is objectively severe and pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id.; see also Henderson v. Waffle House, Inc., 238 F. App'x 499, 501 (11th Cir. 2007).

"Properly applied, [this standard] will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Id. "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. (citation omitted).

Before analyzing whether Adams faced objectively severe and pervasive harassment, the Court recognizes that none of Adams's complaints were related to her religious preference. (Doc. 64 at 29). Thus, to survive summary judgment, Adams must show that a reasonable jury could find she faced objectively severe and pervasive based on her race, sex, or sexual orientation.

**1. Adams's alleged incidents of harassment.**

During Adams's six-month training, she made a formal complaint against Martinez for calling her masculine nicknames, such as macho man, and for commenting that he did not want to work with women. (Doc. 59-1 at 28 p. 75; Doc. 65-1 at 18 p. 78). Adams was led to file this complaint after a verbal altercation with Martinez that escalated. (Doc. 65-1 at 18 p. 78). After making the

complaint, Martinez was warned to cease the conduct, which did slightly subside according to Adams. (Id. at 17 p. 77).

During Adams's training, she made an informal complaint to her Collective mentors about a rope week incident where she heard and witnessed other trainees attempting to tie nooses. (Doc. 65-1 at 20–21 pp. 81–82). According to Adams, her mentors "just brushed it off." (Id. at 22 p. 84).

Within her first few months at Lathan Station, Adams informally told Shoots that Rutland and a driver at the station would regularly call her sir or guy. (Id. at 33–34 pp. 113–14). Adams also told Shoots that Rutland made comments about the "fire department going to hell" and the firefighters not being able to walk around in their underwear or say certain things. (Id. at 4 p. 60). Adams also recalls Rutland saying that he did not want to work with women. (Doc. 65-1 at 24 p. 89).

While at Lathan Station, Adams submitted a formal complaint against Haney concerning his use of vulgar language about a fan and for making undisclosed comments about feminism in a degrading manner three times. (Doc. 65-11 at 3). A few weeks after Rutland submitted a complaint against Adams, Adams "gathered a lot of incidents" she had with Rutland and made a formal complaint to Craig. (Doc. 59-1 at 37 p. 89; Doc. 65-12 at 3). This complaint alleged, among other things, Rutland getting too close to Adams and Rutland making comments about her being angry. (Doc. 65-12). Adams perceived that Rutland calling her "angry" was an attempt to provoke her. (Id.).

Adams made an informal complaint to her Collective mentors about a comment made by Nicholson. (Doc. 65-1 at 31 p. 104). Adams states that Nicholson told her: "[N]o offense, but I just want to let you know that you look real good in your uniform, and stuff like that." (Id.). Adams recalls Nicholson also making comments about Adams trying men one day. (Id.).

Adams also recalls Haney, Rutland, and another employee discussing why Adams did not want to be with a man and stating that maybe she should try it. (Id. at 26 p. 94). Adams also told someone, who brought it to the attention of Busby, that another employee asked if it was okay if the other firefighters slept next to her in her underwear. (Id. at 57 p. 237).

Adams recalls other interactions at Lathan, including Rutland commenting that they would take a Johnny Mop and lubricate it and shove it into the rear ends of new recruits and that if the recruit was a woman, they would get a woman to do it. (Doc. 65-1 at 25–26 pp. 93–94). Adams also recalls Haney, Rutland, and another employee discussing why Adams did not want to be with a man and stating that maybe she should try it. (Id. at 26 p. 94).

### 2. When viewed objectively, Adams's alleged incidents do not show severe or pervasive harassment based on her protected characteristics.

None of the described behavior is to be condoned in a professional work environment. But this Court must follow Eleventh Circuit precedent, and these comments and interactions are not sufficient to survive summary judgment on a sex-based[11] or race-based[12] hostile work environment

---

[11] Compare Guthrie v. Waffle House, Inc., 460 F. App'x 803, 804–08 (11th Cir. 2012) (explaining that conduct was not sufficiently severe or pervasive when alleged harasser grabbed the plaintiff's butt, talked dirty to her, and put his arms around her shoulders on multiple occasions), and Leeth v. Tyson Foods, Inc., 449 F. App'x 849, 853 (11th Cir. 2011) (explaining that conduct was not sufficiently severe or pervasive when alleged harasser tried to pull the plaintiff onto his lap and touch her hand, constantly made sexual comments, visited plaintiff's house uninvited, and followed her around the workplace), with Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 813 (11th Cir. 2010) (explaining that genuine issue of fact remained as to whether conduct was severe or pervasive when coworkers made *daily comments* about women on account of their sex, including use of the terms "whore," "bitch," and "cunt;" participated in vulgar discussions of women's breasts, nipples, and buttocks; and displayed a pornographic image of a woman in the office), and Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238 (11th Cir. 2004) (explaining that genuine issue of fact remained as to whether conduct was severe or pervasive when male supervisor made *at least eighteen* sexual advances during an approximate two-week span, repeatedly attempted to touch plaintiff's breasts and to place his hands down her pants).

[12] Compare McCann v. Tillman, 526 F.3d 1370 (11th Cir.), cert. denied, 129 S. Ct. 404 (2008) (explaining that conduct was not sufficiently severe or pervasive when, over a period of two years, a white employee called the plaintiff her "girl" and called two African American male employees

claim. In all harassment cases, context matters and common sense guides. For example, a "professional football player's working environment is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Id. at 82. Here, the context is a fire station, and common sense guides that Adams's alleged harassment was neither severe nor pervasive pursuant to Eleventh Circuit precedent.

Martinez's use of masculine nicknames was not frequent or severe. Adams filed a complaint after a verbal altercation between her and Martinez escalated. Martinez was warned to cease the conduct. Adams testifies that the conduct did slightly subside, and Hunter testifies that she did not hear another complaint from Adams about Martinez. Likewise, the other trainees attempting to tie nooses during rope week was neither frequent nor severe. This incident occurred once—when trainees were learning about ropes and how to tie knots. Adams made an informal complaint to her Collective mentors—one of whom is a female African American—who Adams claimed brushed it off. No reasonable jury could conclude that these incidents were objectively severe or pervasive.

Adams's allegations that other firefighters discussed why she did not want to be with a man, regularly called her sir or guy, and questioned whether it was okay if they slept next to her in her underwear do not show objectively severe or pervasive harassment. Neither do Rutland's

"boys" and another coworker referred to a former African American employee as a "nigger bitch"), with Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) (explaining that jury did not unreasonably find that conduct was severe and pervasive when a coworker made ethnic slurs at plaintiff *three to four times a day*).

purported statements that he did not want to work with women [13] and Nicolson's purported statement that Adams looked good in her uniform. Again, context matters. Under Eleventh Circuit caselaw, these comments are not sufficient to support Adams's claim for hostile work environment as a female firefighter. See, e.g., Smart v. City of Miami Beach, 933 F. Supp. 2d 1366 (S.D. Fla. 2013), aff'd, 567 F. App'x. 820 (11th Cir. 2014) (explaining that conduct was not severe or pervasive despite twelve instances of alleged harassment against female firefighter, including having her bathing suit stolen from her locker and returned with semen on it and having her belongings thrown onto the floor by a coworker after she left them in an area designated for other employees); see also West v. City of Houston, 960 F.3d 736 (5th Cir. 2020) (per curiam) (explaining that alleged harassment of female, African American firefighter was not severe or pervasive when male coworkers slept in their underwear, grabbed their private parts, flatulated, made racially derogatory comments, and left adult magazines in common area).

Adams's formal complaint against Haney was the result of an argument between the two over a fan. In that complaint, Adams listed incidents that she had stored on her phone regarding Haney. This included three instances where Haney made comments about feminism and women's rights in a degrading manner and where Haney called her a rookie and insisted that she make her bed before 8:00 P.M. Likewise, Adams's formal complaint against Rutland came after Rutland filed a complaint against her claiming that she made outbursts that were problematic. Nothing in Adams's complaint alleged gender discrimination, but Adams did write that Rutland calling her angry made her feel as though he was provoking her.[14]

---

[13] Rutland denies making this statement, (Doc. 65-5 at 3 p. 11), but we presume it was made for purposes of summary judgment.

[14] Adams references the phrase "angry black woman" in her complaint against Rutland, but she does not allege that Rutland used this phrase. OPR investigated and found that Adams denied that Rutland used the phrase "angry black woman."

In short, none of the Haney- and Rutland-incidents alleged by Adams show severe or pervasive work conditions. Adams alleges that Haney made general comments about feminism and women's rights and that Rutland called her angry. Objectively, these statements are not physically threatening or humiliating. Moreover, these allegations stem from personal arguments. "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place." Succar v. Dade Cnty. Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) (quoting McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986)). As such, "[p]ersonal animosity is not the equivalent of sex discrimination. . . . The plaintiff cannot turn a personal feud into a sex discrimination case by accusation." Id. (quoting McCollum, 794 F.2d at 610).

Adams does recall one statement that is certainly vulgar and unprofessional—the Johnny Mop statement. Assuming this statement was made and reported,[15] it still does not advance Adams's contention of a hostile work environment based on race, sex, sexual orientation, or religion. This statement purportedly applied to all new recruits. The threatened violence was not based on a protected characteristic. Therefore, the statement was objectionable but not actionable through Adams's claim.

In sum, Adams has not produced sufficient evidence from which a reasonable jury could find that she faced a hostile work environment. Therefore, the City's motion for summary judgment is **granted** as to the second, fifth, and seventh causes of action alleging hostile work environment.

---

[15] Adams is "pretty sure she submitted" this complaint, (Doc. 65-1 at 26 p. 94), but the complaint is not in the evidence. Nor was it included in the litany of complaints that Adams filed against Rutland. The Eleventh Circuit has explained, and repeated, that if the plaintiff did not want the harassing behavior reported, then the employer would not have been place on proper notice. Olson v. Lowe's Home Ctrs., Inc., 130 F. App'x. 380, 391 n.21 (11th Cir. 2005); Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1310 (11th Cir. 2007).

### C.  Retaliation Claims under Title VII: The Third Cause of Action

Adams's third cause of action alleges retaliation pursuant to Title VII. (Doc. 1). Adams claims she was fired for making complaints of workplace discrimination and harassment. (Id.). The Eleventh Circuit "has 'primarily' relied on the McDonnell Douglas framework to evaluate circumstantial-evidence-based employment claims at summary judgment." Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1337 (11th Cir. 2023). As such, a prima facie claim of retaliation under Title VII requires that the plaintiff show: (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that she established a causal link between the protected activity and the adverse action. See, e.g., Bryan v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009). Establishing these elements creates a presumption that the adverse action was retaliation. Id. at 1308. "If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual and that the real reason was retaliation. Id. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*).

### 1.  Elements one and two: statutorily protected activity and adverse employment action.

Neither party disputes that Adams submitted complaints about her coworkers and that Adams was fired. (Doc. 61 at 28; Doc. 64 at 31). However, the City argues that "general complaints or unfairness, or incivility without connecting those complaints to illegal discrimination don't constitute constitutionally protected activity." (Doc. 61 at 28). In support, the City cites Bowens v. Escambia Cnty. Bd. of Educ., No. 22-11560, 2023 WL 4145424, at *4 (11th Cir. June 23, 2023).

In Bowens, the Eleventh Circuit affirmed the district court's order granting summary judgment in favor of an employer for race discrimination and retaliation. Id. The court concluded that the plaintiff did not engage in statutorily protected activity even though she had voiced complaints about a pay increase and her assigned duties. Id. The court explained that none of the plaintiff's written complaints mentioned race or racial discrimination, and nothing evidences that plaintiff's complaints alleged disparate treatment based on race. See id. ("Absent any allegation about discrimination based on a protected ground, Plaintiff's grievances alleging unfair treatment were not statutorily-protected conduct.").

Adams argues that her complaints are a statutorily protected activity because she complained of activity that was directly targeted at her gender, race, and sexual orientation and because Adams has a reasonable belief that the conduct she complained of constituted unlawful employment discrimination. (Doc. 64 at 31). To engage in protected activity, an employee must explicitly or implicitly communicate a belief that the employer's conduct constitutes unlawful employment discrimination. Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016). Given the informal and formal complaints in the record, Adams has established that she engaged in statutorily protected activity when she made race- and gender-based complaints. Thus, Adams has established the first two elements. The issue is whether Adams's complaints are causally linked to her termination.

### 2. Element three: causal link.

The mixed-motive framework does not apply to Title VII retaliation claims. Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1338 (11th Cir. 2023). "Both at the prima facie stage and at the stage of analysis after which the defendant has articulated a legitimate, nonretaliatory reasons

for its action, the plaintiff is called on to show that the evidence demonstrates the requisite causal connection." Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1294 (11th Cir. 2021).

At the prima facie stage, the plaintiff can prove a causal link by showing "that the protected activity and the adverse action were not wholly unrelated." Id. (quoting Gogel, 967 F.3d at 1135). A plaintiff can prove this "by showing close temporal proximity between the statutorily protected activity and the adverse . . . action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). However, "mere temporal proximity, without more, must be very close". Id.

If the defendant has rebutted the prima facie case with a legitimate, nonretaliatory reason, the plaintiff must meet the but-for test—which is more demanding. Tolar, 997 F.3d at 1294. The but-for standard asks whether 'a particular outcome would not have happened "but-for" the purported cause.'" Yelling, 82 F.4th at 1338 (quoting Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020)). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." Id. (quoting Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924 (11th Cir. 2018)).

Here, at the prima facie stage, Adams must prove that her complaints and her termination were not wholly unrelated. In most cases, a close temporal proximity between the protected conduct and the adverse action shows that they are not wholly unrelated. Id. But "[a] three-to-four-month disparity between the statutorily protected activity and the adverse employment action is not enough." Thomas, 506 F.3d at 1364. Without other evidence tending to show causation, a substantial delay between the activity and the adverse action results in a retaliation claim failing as a matter of law. Id.

Adams argues that the City knew of her protected activity because she made multiple complaints of discrimination and harassment, both formal and informal—notably her complaint against Haney regarding feminism and women's rights and her complaint against Rutland

regarding angry black women and encroaching on her space. (Doc. 64 at 33). Adams argues that her protected activity and the adverse action were not wholly unrelated because her "complaints, particularly the one she lodged against Rutland were made less than one month prior to her termination." (Doc. 64 at 33) (citing Doc. 65-13).

Based on the record, Adams was terminated on November 10, 2022. (Doc. 59-34). Adams made a formal complaint against Haney on August 3, 2022. (Doc. 65-11 at 3). Adams lodged her formal complaint against Rutland on September 11, 2022. (Doc. 59-1 at 37 p. 89; Doc. 65-12 at 3; Doc. 65-13 at 2). OPR issued a memorandum on Adams's complaint against Rutland on November 3, 2022. (Doc. 65-13). Thus, Adams was fired about three months after her complaint against Haney and about two months after her complaint against Rutland.

Two factors weigh against Adams's purported causal connection here. *First*, a two-month gap between a complaint and an adverse employment action is not "very close." Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 230 (11th Cir. 2011). Here, the closest complaint that Adams made alleging discrimination was about two months prior to her firing. *Second*, temporal proximity between the protected activity and later adverse employment action does not show causation when an employer contemplates the action before the employee engages in the protected activity. Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006). Here, before Adams lodged her complaint against Rutland, the City had contemplated terminating her employment. During the September 8, 2022, advisory hearing, the City explained to Adams that her probationary period would be extended for six months. (Doc. 59-21). The City also explained that Adams's failure to properly cover her neck and head tattoo would lead to termination. (Id.). Therefore, the temporal proximity between her complaint against Rutland and her termination is not sufficient to show causation. See Drago, 453 F.3d at 1308 ("We hold that, in a retaliation case, when an employer contemplates an adverse

employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

Even assuming that Adams could make a prima facie showing of retaliation, the City has articulated a legitimate, nondiscriminatory reason for her termination. Adams was terminated after the City determined that she violated MFRD rules and MCPB Rule 14.2 (Doc. 59-34). These articulated reasons included her failure to cover her head and neck tattoo, her failure to comply with directives from her supervisors, and her lack of candor during the investigation. (Doc. 59-32). This means that Adams would have to satisfy the more demanding but-for test. In other words, Adams must ultimately prove that had she not complained, she would not have been fired. See Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1338 (11th Cir. 2023).

Prior to Adams's complaint against Rutland, the City had already warned her that a failure to adequately cover her tattoo would lead to termination. It was determined that Adams failed to adequately cover her tattoo as she had been directed (by keeping her hair grown out to cover it), and that Adams failed to follow orders when the MFRD investigated her compliance. In short, Adams does not have sufficient evidence for a reasonable jury to find that the complaints against Haney and Rutland were the but-for cause of her termination. Therefore, the City's motion for summary judgment is **granted** as to the third cause of action alleging retaliation.

### IV. Conclusion

Adams has failed to produce sufficient evidence for a reasonable jury to infer that the City discriminated against her. Thus, summary judgment is **GRANTED** as to the **first**, **fourth**, and **sixth** causes of action alleging **discrimination**. Adams has failed to produce sufficient evidence for a reasonable jury to find that she faced hostile work environment. Thus, summary judgment is

**GRANTED** as to the **second**, **fifth**, and **seventh** causes of action alleging **hostile work environment**. Adams has failed to show a sufficient causal connection between her statutorily protected activity and her termination. Thus, summary judgment is **GRANTED** as to the **third** cause of action alleging **retaliation**.

**DONE** and **ORDERED** this **20th** day of **November 2024**.

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**